**[Initial Brief]**

ORAL ARGUMENT SCHEDULED FOR MAY 24, 2017

**No. 15-1345**

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Raymond J. Lucia Companies, Inc. and Raymond J. Lucia,
Petitioners,

v.

Securities and Exchange Commission,
Respondent.

---

On Petition for Review of an Order of the
Securities and Exchange Commission

---

# BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, RESPONDENT

---


MICHAEL A. CONLEY
Solicitor

DOMINICK V. FREDA
Assistant General Counsel

MARTIN V. TOTARO
Senior Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-7962 (Totaro)

CHAD A. READLER
Acting Assistant Attorney General

MARK B. STERN
MARK R. FREEMAN
MELISSA N. PATTERSON
MEGAN BARBERO
DANIEL AGUILAR
TYCE R. WALTERS
(202) 532-4631 (Barbero)

Attorneys, Appellate Staff
Civil Division, Room 7226
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

In addition to the parties, intervenors, and amici listed in the Brief for Petitioners, RD Legal Capital, LLC and Roni Dersovitz are amici for petitioners.

### B. Rulings Under Review

On September 3, 2015, the Commission issued the order under review, *Raymond J. Lucia Companies, Inc. and Raymond J. Lucia, Sr.*, Exchange Act Release No. 75837 (Sept. 3, 2015). On August 9, 2016, a panel of this Court issued an opinion affirming the Commission's decision. *Raymond J. Lucia Cos., Inc. v. SEC*, 832 F.3d 277 (D.C. Cir. 2016), *rehearing en banc granted* Feb. 16, 2017.

### C. Related Cases

The case on review has not previously been before this, or any other, Court. Counsel is not aware of any related cases currently pending in this, or any other, Court.

As the Commission previously noted in its letter to the Court dated November 12, 2015 (Doc. No. 1583354), however, and as petitioners note in their brief, a number of other active cases and proceedings involve Appointments Clause challenges to the Commission's use of administrative law judges. In addition to the cases previously listed by the parties, the Commission is aware of the following

pending cases that also involve an Appointments Clause challenge to the Commission's use of administrative law judges:[1]

*Jacob Keith Cooper v. SEC*, No. 15-73193 (9th. Cir.)

*Harding Advisory LLC, et al v. SEC*, No. 17-1070 (D.C. Cir.)

*Thomas C. Gonnella v. SEC*, No. 16-3433 (2d Cir.)

*Malouf v. SEC*, No. 16-9546 (10th Cir.)

*The Robare Group, LTD., et al. v. SEC*, No. 16-1453 (D.C. Cir.)

*Bernerd E. Young v. SEC*, No. 16-1149 (D.C. Cir.)

*Alexander Kon*, No. 3-17674 (SEC) & No. 17-3066 (10th Cir.)

*        *        *

*Augustine Capital Management LLC, et al.*, No. 3-17740 (SEC)

*Laurence I. Balter*, No. 3-17614 (SEC)

*Robert L. Baker, et al.*, No. 3-17716 (SEC)

*Adrian D. Beamish, CPA*, No. 3-17651 (SEC)

*Bioelectronics Corp. et al.*, No. 3-17104 (SEC)

*Michael W. Crow et al.*, No. 3-16318 (SEC)

*Christopher M. Gibson*, No. 3-17184 (SEC)

*Donald F. Lathen, Jr.*, No. 3-17387 (SEC)

---

1 By listing these cases, the Commission does not acknowledge that the challenges contained therein or in the cases listed by petitioners have been properly presented or preserved.

*RD Legal Capital, LLC & Roni Dersovitz*, No. 3-17342 (SEC)

*Gary Snisky*, No. 3-17645 (SEC)

*Paul Leon White II*, No. 3-17210 (SEC)

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .................i

GLOSSARY .....................................................................................xiii

INTRODUCTION .....................................................................................1

STATEMENT OF JURISDICTION ....................................................................4

CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS .........4

STATEMENT OF THE ISSUES.......................................................................4

STATEMENT OF THE CASE..........................................................................4

A. Statement of Facts .......................................................................5

B. Proceedings Before the Commission ..............................................6

C. Panel Decision.................................................................................8

STANDARD OF REVIEW ..............................................................................11

SUMMARY OF ARGUMENT..........................................................................11

ARGUMENT ....................................................................................................13

THE COMMISSION'S ALJS ARE CIVIL SERVICE EMPLOYEES OF THE COMMISSION, NOT OFFICERS OF THE UNITED STATES ........................................13

A. The Commission employs ALJs as aides to the Commission's adjudicative functions, retaining all authority in the Commission itself. ..........13

B. The Commission's use of its ALJs reflects its own longstanding practice and the model of administrative adjudication codified in the APA..................19

C. Petitioners fundamentally err in analogizing ALJs to judges in military, Article I, and Article III courts. ..........................................................26

D. Petitioners' Other Arguments Are Similarly Without Merit. ............................37

E. The Court In *Landry* Correctly Held That The ALJs In That Case Were Not Constitutional Officers ....................42

CONCLUSION ....................44

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Aaronson v. Commissioner*,
T.C. Mem. 1985-131 (1985) ....................31

*Andrade v. Regnery*,
824 F.2d 1253 (D.C. Cir. 1987)....................26

*Association of Admin. Law Judges v. Colvin*,
777 F.3d 402 (7th Cir. 2015) ....................26

*Bandimere v. SEC*,
844 F.3d 1168 (10th Cir. 2016), *pet. for reh'g filed*,
No. 15-9586 (Mar. 13, 2017) .................... 13, 27, 41, 44

*Brock v. Cathedral Bluffs Shale Oil Co.*,
796 F.2d 533 (D.C. Cir. 1986)....................24

* *Buckley v. Valeo*,
424 U.S. 1 (1976).................... 1, 12

*Bush v. Lucas*,
462 U.S. 367 (1983) ....................24

*Butz v. Economou*,
438 U.S. 478 (1978) .................... 40, 41

*Edmond v. United States*,
520 U.S. 651 (1997) .................... 12, 36

*First W. Gov. Securities, Inc. v. Commissioner*,
94 T.C. 549 (1990) ....................29

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ....................38

* Authorities upon which we chiefly rely are marked with asterisks.

* *Freytag v. Commissioner*,
501 U.S. 868 (1991) .......... 2, 13, 26, 27, 28, 29, 30, 31, 33, 35, 36

*Go-Bart Importing Co. v. United States*,
282 U.S. 344 (1931) .......... 35, 36

*ICC v. Brimson*,
154 U.S. 447 (1894) .......... 32

*Kay v. FCC*,
396 F.3d 1184 (D.C. Cir. 2005) .......... 24

*Landry v. FDIC*,
204 F.3d 1125 (D.C. Cir. 2000) .......... 2, 4, 13, 42

*Mahoney v. Donovan*,
721 F.3d 633 (D.C. Cir. 2013) .......... 25

*Munoz Santos v. Thomas*,
830 F.3d 987 (9th Cir. 2016) .......... 36

*NLRB v. Noel Canning*,
134 S. Ct. 2550 (2014) .......... 3, 43

*The Pocket Veto Case*,
279 U.S. 655 (1929) .......... 3, 43

* *Ramspeck v. Federal Trial Exam'rs Conference*,
202 F.2d 312 (D.C. Cir. 1952) .......... 21
345 U.S. 128 (1953) .......... 1, 11, 12, 21, 23, 24, 25, 37, 41

*Ex parte Robinson*,
86 U.S. (19 Wall.) 505 (1874) .......... 33

*Roell v. Withrow*,
538 U.S. 580 (2003) .......... 35

*Ryan v. Commissioner*,
67 T.C. 212 (1976) .......... 31

*Shillitani v. United States*,
384 U.S. 364 (1966) .......... 33

*Tucker v. Commissioner*,
676 F.3d 1129 (D.C. Cir. 2012) .......... 26, 27

*United States v. Mouat*,
124 U.S. 303 (1888) .......... 42

*Venetian Casino Resort, L.L.C. v. NLRB*,
793 F.3d 85 (D.C. Cir. 2015) .......... 11

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
435 U.S. 519 (1978) .......... 24

*Weiss v. United States*,
510 U.S. 163 (1994) .......... 36, 37

**U.S. Constitution:**

* Art. II, sec. 2, cl. 2 (Appointments Clause) .......... 1, 4, 5, 7, 12, 26, 29, 31, 33, 38

**Statutes:**

Act of June 29, 1906, ch. 3951, 34 Stat. 584 .......... 20

Act of Mar. 27, 1978, Pub. L. No. 95-251, 92 Stat. 183 .......... 25

* Administrative Procedure Act, 60 Stat. 237 (1946) .......... 1, 2, 10, 11, 12, 19, 22, 23, 24, 37, 38
5 U.S.C. § 557(b) .......... 2, 24
5 U.S.C. § 3105 .......... 23, 38

All Writs Act, 28 U.S.C. § 1651(a) .......... 32

Civil Service Reform Act of 1978,
Pub. L. No. 95-454, 92 Stat. 1111 .......... 25

Deficit Reduction Act of 1984,
Pub. L. No. 98-369, div. A, tit. IV, subtit. E, 98 Stat. 494 .......... 28

Investment Advisers Act of 1940:
15 U.S.C. § 80b-3 .......... 4
15 U.S.C. § 80b-13(a) .......... 4

Pub. L. No. 59-337 .......... 24

Revenue Act of 1924, ch. 234, 43 Stat. 253 .......... 27-28

Revenue Act of 1943, ch. 63, 58 Stat. 21 (1944) .......... 28

Tax Reform Act of 1969, Pub. L. No. 91-172, 83 Stat. 487 .......... 28

5 U.S.C. § 1104(a)(2) .......... 25

5 U.S.C. § 2104(a)(1)(C) .......... 38

5 U.S.C. § 7521 .......... 25

10 U.S.C. § 816(1)(A) .......... 36

10 U.S.C. § 848(a)(3) .......... 36

10 U.S.C. § 848(b) .......... 36

10 U.S.C. § 867(a) .......... 37

15 U.S.C. § 78d(a) .......... 13

15 U.S.C. § 78d-1(a) .......... 14, 39

*15 U.S.C. § 78d-1(b) .......... 14

*15 U.S.C. § 78d-1(c) .......... 10, 19, 39

15 U.S.C. § 78u(e) .......... 32

18 U.S.C. § 3041 .......... 35

18 U.S.C. § 3141(a) .......... 36

18 U.S.C. § 3142(a)(4) .......... 36

18 U.S.C. § 3144 .......... 36

18 U.S.C. § 3184 .......... 36

18 U.S.C. § 3231 .....34
18 U.S.C. § 3401(a) .....36
26 U.S.C. § 7456(c) .....31
28 U.S.C. § 566(a) .....32
28 U.S.C. § 636(a)(4) .....36
28 U.S.C. § 636(c)(1) .....35
28 U.S.C. § 636(c)(3) .....35
28 U.S.C. § 636(e) .....35
28 U.S.C. § 1291 .....34
28 U.S.C. § 1331 .....34
28 U.S.C. § 2521 .....32
38 U.S.C. § 7265 .....32
D.C. Code § 11-741 .....32
D.C. Code § 11-944 .....32

**Regulations:**

5 C.F.R. § 930.201(d)-(e) .....25
17 C.F.R. § 200.14(a)(2) .....32
17 C.F.R. § 201.111 .....15
17 C.F.R. § 201.180(a)(1) .....32
17 C.F.R. § 201.180(a)(2) .....32
* 17 C.F.R. § 201.360(d) .....18
* 17 C.F.R. § 201.360(d)(2) ..... 8, 18

* 17 C.F.R. § 201.411(a) ....8, 9, 16, 17

17 C.F.R. § 201.411(b)(2)(ii)(A) ....16

17 C.F.R. § 201.411(c) .... 9, 16

17 C.F.R. § 201.452 .... 8, 9, 17

**Rule:**

Fed. R. Crim. P. 3 ....36

**Legislative Materials:**

*Administrative Procedure: Hearings Before a Subcomm. of the S. Comm. on the Judiciary*, 77th Cong. 250 (1941) ....22

*Administrative Procedure in Government Agencies*, S. Doc. No. 77-8 (1941) .... 20, 21

H.R. Rep. No. 79-1980 (1946) ....21

S. 5154, 70th Cong. (1929) ....22

S. 1835, 73d Cong. (1933) ....22

S. 3787, 74th Cong. (1936) ....22

**Other Authorities:**

*Attorney General's Manual on the Administrative Procedure Act* (1947) .... 2, 24

*Authority of Education Department Administrative Law Judges in Conducting Hearings*, 14 Op. O.L.C. 1 (1990) .... 40, 41

Kenneth Culp Davis, *Separation of Powers and Liberty*, 63 S. Cal. L. Rev. 1515 (1990) ....38

*Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73 (2007) .... 1, 39

President's Comm. Admin. Mgmt., *Administrative Management in the Government of the United States* (1937) ....................21

Antonin Scalia, *The ALJ Fiasco—A Reprise*, 47 U. Chi. L. Rev. 57 (1979)....................25

*Secretary of Education Review of Administrative Law Judge Decisions*, 15 Op. O.L.C. 8, 14 (1991)....................40

Securities & Exchnage Commission:

*In re Alchemy Ventures, Inc.*, 2013 WL 6173809 (Oct. 17, 2013) ....................18

*In re Bellows*, 1998 WL 611766 (Sept. 8, 1998)....................16

*In re Dian Min Ma*, 2015 WL 2088438 (May 6, 2015)....................16

*In re Michael Lee Mendenhall*, 2015 WL 1247374 (Mar. 19, 2015)....................16

Special Comm. on Admin. Law, Am. Bar Ass'n, *1934 ABA Annual Report* (1934) ....................22

Edward Susolik, Note, *Separation of Powers and Liberty: The Appointments Clause,* Morrison v. Olson*, and Rule of Law*, 63 S. Cal. L. Rev. 1515 (1990)....................42

## GLOSSARY

| | |
|---|---|
| ALJ | Administrative Law Judge |
| APA | Administrative Procedure Act |
| Br. | Petitioners' En Banc Brief |
| Commission or SEC | Securities and Exchange Commission |
| FDIC | Federal Deposit Insurance Corporation |
| JA | Deferred Joint Appendix |
| Lucia | Petitioner Raymond J. Lucia and, collectively, Raymond J. Lucia Companies |
| MSPB | Merit Systems Protection Board |
| OPM | Office of Personnel Management |
| Op. | Opinion of the panel |
| SEC Op. | Opinion of the Commission |

## INTRODUCTION

A unanimous panel of this Court correctly held that the administrative law judges (ALJs) employed by the Securities and Exchange Commission are employees of the Commission, not "inferior Officers" who must be appointed in the manner prescribed by the Appointments Clause. An "Officer" under the Constitution is a federal official who, in his own right, "exercis[es] significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). As the panel explained, "the Commission's ALJs neither have been delegated sovereign authority to act independently of the Commission nor, by other means established by Congress, do they have the power to bind third parties, or the government itself, for the public benefit." JA__[Op. 13] (citing 31 Op. O.L.C. 73, 87 (2007)).

The Commission's use of its ALJs reflects essential features of agency adjudicative practice that predate and were largely codified in the Administrative Procedure Act (APA). Agencies, including the SEC, had long employed hearing examiners to aid decisionmakers in the initial stages of a proceeding. As the Supreme Court explained in *Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128 (1953), Congress retained hearing examiners in the APA as "classified Civil Service employees," *id.* at 133, to provide non-political support for the administrative process, *see id.* at 142. Congress contemplated that the "initial decision[s]" of hearing examiners would "in no way b[i]nd" an agency, and that the agency would retain

"complete freedom of decision—as though it had heard the evidence itself." *Attorney General's Manual on the Administrative Procedure Act* 83 (1947) (*Attorney General's Manual*).

Under the securities laws and the APA alike, all adjudicative authority resides in the politically accountable agency heads. As the Commission explained in the decision on review, ALJs function entirely as aides to the Commission's decision-making process, conducting only such tasks as the Commission may assign them, and cannot bind the agency's discretion in any respect. JA__[SEC Op. 30-31]. No separate authority is vested in the ALJ. *See, e.g.*, 5 U.S.C. § 557(b) (on review of an ALJ decision, "the agency has all the powers which it would have in making the initial decision"); JA__[Op. 18]. For the same reasons applicable to the Commission's ALJs in this case, the ALJs of the Federal Deposit Insurance Corporation (FDIC), at issue in *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000), are employees and not constitutional Officers. In both agencies, the ALJs assist with the initial stages of adjudications, while all authority remains with the politically accountable agency heads.

The Supreme Court's decision in *Freytag v. Commissioner*, 501 U.S. 868 (1991), provides no basis for questioning the constitutionality of this longstanding administrative scheme. *Freytag* held that special trial judges of the Tax Court were properly appointed by the Chief Judge of the Tax Court, an Article I court whose orders are enforceable by fine and imprisonment. It was conceded that the special trial judges—who as judges on "an Article I court could exercise the judicial power of

the United States" (JA__[Op. 9])—were officers for most purposes because they were empowered to enter final decisions and to enforce compliance with their orders. Petitioners incorrectly seek to equate such Article I court judges—as well as magistrate judges, who also exercise the judicial power and issue final decisions in certain categories of cases—with civil service employees who exercise no independent power in their own right but simply assist politically accountable agency heads in performing their functions under law. Petitioners similarly err in equating the decisions of the Commission's ALJs to decisions of federal district court and military judges on the ground that these decisions may be subject to appellate review. A district court exercises authority vested in it by statute; it does not exercise functions allotted to it at the discretion of the court of appeals, and its judgment issues as that of the district court, not as the judgment of the court of appeals.

ALJs and their predecessors have assisted agency heads in their adjudicative functions for many decades under the APA without apparent infringement on executive branch authority. Such a "'[l]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions' regulating the relationship between Congress and the President." *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559-60 (2014) (alteration in original) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). This Court should—as the panel did—reject petitioners' invitation to "cast aside a carefully devised scheme established after years of legislative consideration and agency implementation." JA__[Op. 18].

## STATEMENT OF JURISDICTION

The Securities and Exchange Commission had jurisdiction pursuant to section 203 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-3. This Court has jurisdiction pursuant to section 213(a) of the Advisers Act, 15 U.S.C. § 80b-13(a).

## CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS

The Addendum to the Brief for Petitioners sets forth the pertinent constitutional provisions, statutes, and regulations.

## STATEMENT OF THE ISSUES

This Court granted rehearing en banc on the following issues:

1.a. Is the SEC administrative law judge who handled this case an inferior officer rather than an employee for the purposes of the Appointments Clause of Article II of the Constitution?

b. Should the Court overrule *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000)?

## STATEMENT OF THE CASE

Petitioner Raymond J. Lucia and his advisory firm petitioned this Court to review a Commission order finding that his firm violated, and that Lucia aided and abetted and caused violations of, the securities laws by fraudulently misrepresenting the strength of Lucia's investment strategy to thousands of prospective clients over the course of a decade. A panel of this Court denied the petition for review, rejecting petitioners' argument that the administrative law judge who presided over the initial stages of the administrative proceeding was an inferior officer subject to the

requirements of the Appointments Clause and upholding the Commission's liability findings and choice of sanction. The en banc Court granted review to consider the Appointments Clause question.

### A. Statement of Facts

Lucia, and his company Raymond J. Lucia Companies, Inc., were registered investment advisers. For approximately ten years, petitioners touted a "Buckets of Money" portfolio-allocation strategy at seminars for prospective clients. JA__[Tr.1061]; JA__-JA__[Tr.1070-71]. During his seminars, Lucia used a slideshow that culminated in two "backtests" to show prospective clients how hypothetical retirees using his Buckets of Money strategy would have fared during two historical periods. JA__-JA__[DX-1.200]; JA__-JA__[DX-1.203-04]; JA__-JA__[DX-1.207-10]. But neither of the backtests accurately conveyed how petitioner's strategy would have performed.

First, the backtests failed to "rebucketize" after all assets but stocks had been exhausted, meaning all of a retiree's assets would be in one higher-risk bucket—a result that Lucia stated he would never advocate. JA__[DX-35.195-96]; *see also* JA__[DX-66.7]; JA__[Tr.536]; JA__[Tr.730]. Petitioners did not disclose that the backtests did not rebucketize after all non-stock assets had been exhausted, which inflated the backtests' results. *See* JA__-JA__[DX-11-DX-12]; JA__[DX-70.15]; JA__-JA__[Tr.948-49]. Second, the backtests failed to use historical inflation rates, JA__[DX-1.204]; JA__[Tr.1079-80], which Lucia acknowledged would have been

"damaging to the results." JA__[Tr.1192]. Third, the backtests did not use certain historical rates of return. *See* JA__[Tr.1378]; JA__[DX-1.204]. Had petitioners performed actual backtests, the model portfolio would have been depleted long before the backtests' end-date. JA__[Tr.1203]; JA__[Tr.947]; JA__[DX-70.7]; JA__[DX-70.11].

### B. Proceedings Before the Commission

The Commission instituted this administrative proceeding and assigned the initial stages to an ALJ. JA__[OIP.10]. After conducting a hearing, the ALJ issued an initial decision that addressed only one of the four charged misrepresentations. JA__-JA__[7.8.13.Decision]. One month later, the ALJ issued an order on Lucia's motion to correct manifest errors of fact. JA__-JA__[8.7.13.Order]. Before either party sought review of the ALJ's initial decision, the Commission, *sua sponte*, directed the ALJ to make factual findings with respect to the three other charges. JA__-JA__[8.9.13.Order]. The ALJ then issued a revised initial decision. JA__-JA__[IDOR]. Petitioners and the Division of Enforcement appealed to the Commission.

After an independent review of the record, the Commission found that petitioners committed antifraud violations and ordered relief. The Commission explained that petitioners' presentation was misleading because it falsely stated that petitioners had backtested a model Buckets of Money portfolio; it falsely stated that backtesting proved that such a portfolio would have withstood two historical market

periods; and petitioners could not replicate the result for one of the backtests. JA__[SEC Op.17]. The Commission concluded that the fraudulent statements were material to investors and that petitioners had acted with scienter. JA__- JA__[SEC Op.19-20].

The Commission rejected petitioners' argument that the proceedings were unlawful on the theory that the ALJ was an inferior officer who was not appointed consistent with the Appointments Clause. JA__-JA__[SEC Op.28-33]. The Commission emphasized that its "ALJs issue 'initial decisions' that are . . . not final," noting that respondents may petition the Commission "for review of an ALJ's initial decision," and that the Commission is "unaware of any cases [in] which the Commission has not granted a timely petition for review." JA__[SEC Op.30]. The Commission explained that it had "eliminated the filing of oppositions to petitions for review [by the Commission] . . . deem[ing] such oppositions pointless." JA__[SEC Op.30 n.105].

The Commission explained that it "may also choose to review a decision on [its] own initiative," which it had done "on a number of occasions." JA__[SEC Op.30]. It stressed that even where a respondent does not timely petition for review of an initial decision and the Commission does not *sua sponte* order review, the Commission's "rules provide that '*the Commission* will issue an order that the decision has become final,' and it 'becomes final' only 'upon issuance of the order' by the Commission." JA__[SEC Op. 30-31] (quoting 17 C.F.R. § 201.360(d)(2)).

The Commission explained that it "reviews its ALJs' decisions *de novo*," and "'may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part,' any initial decision." JA__[SEC Op.31] (quoting 17 C.F.R. § 201.411(a)). The Commission itself may "'hear additional evidence' . . . and may 'make any findings or conclusions that in [its] judgment are proper and on the basis of the record.'" *Id.* (quoting 17 C.F.R. §§ 201.411(a), 201.452). As the Commission summarized, it has "plenary authority over the course of [its] administrative proceedings and the rulings of [its] law judges—before and after the issuance of the initial decision and irrespective of whether any party has sought relief." *Id.* (quotation marks omitted).

Commissioners Gallagher and Piwowar dissented with respect to one aspect of the Commission's liability determination. JA__[SEC Dissenting Op.2].

**C. Panel Decision**

On review of the Commission's final order, a unanimous panel of this Court sustained the Commission's findings that petitioners, acting with scienter, had made material misstatements. JA__[Op.19-31]. That holding is not at issue here.

Rejecting petitioners' Appointments Clause challenge, the panel explained that "the Commission's ALJs" cannot "act independently of the Commission" and do not "have the power to bind third parties, or the government itself, for the public benefit." JA__[Op.13]. The panel examined in detail the provisions governing the

SEC's administrative process and the Commission's explanation of the functions performed by its ALJs in the decision on review. JA__[Op.2-6; Op.12-17].

Either the respondent or the government may seek review of an ALJ's initial decision, and, as the panel explained, the Commission reviews ALJ initial decisions de novo and it "may make any findings or conclusions that in its judgment are proper and on the basis of the record," JA__[Op.16] (quoting 17 C.F.R. § 201.411(a)); it "controls the record for review and decides what is in the record," *id.* (quotation marks omitted); and it "may 'remand for further proceedings,'" *id.* (quoting 17 C.F.R. § 201.411(a)), or "the taking of additional evidence," *id.* (quoting 17 C.F.R. § 201.452).

The limited authority provided to SEC ALJs is also reflected in the Commission's treatment of cases in which neither party appeals an ALJ's initial decision. The Commission's regulations provide it with "time to determine whether it wishes to order review even when no petition for review is filed." JA __[Op.12] (citing 17 C.F.R. § 201.411(c)). The panel rejected petitioners' characterization of the Commission's finality order as a "ministerial formality," explaining that the Commission's ALJ's "initial decision becomes final when, and only when, the Commission issues [a] finality order, and not before then. Thus, the Commission must affirmatively act—by issuing the order—in every case." JA__[Op.13] (citation omitted). Until the finality order issues, "there is no final decision that can 'be

deemed the action of the Commission.'" *Id.* (quoting 15 U.S.C. § 78d-1(c)). The panel rejected petitioners' attempts to distinguish the SEC's use of its ALJs from the FDIC scheme at issue in *Landry* based either on a purported "difference between the FDIC's recommended decisions [at issue in *Landry*] and the Commission's initial decisions," JA__[Op.15], or on the basis of the scope of review by the agency heads.

The panel also rejected petitioners' attempt to equate the functions of the Commission's ALJs with those of the special trial judges in *Freytag*, who as judges "of an Article I court could exercise the judicial power of the United States" and "issue final decisions in at least some cases." JA__[Op.9-10]. The panel noted that, by contrast to the Commission, "the Tax Court in *Freytag* was required to defer to the special trial judge's factual and credibility findings unless they were clearly erroneous." JA__[Op.16] (quotation marks omitted).

The panel observed that the Commission's treatment of its ALJs' initial decisions was consistent with the APA, which "envisioned that notwithstanding an ALJ's initial decision, the agency could retain 'complete freedom of decision.'" JA__[Op.17] (quoting *Attorney General's Manual* 83). Because petitioners "failed to demonstrate that Commission ALJs perform such duties as would invoke [the Appointments Clause] requirement," the panel concluded that it "could not cast aside a carefully devised scheme established after years of legislative consideration and agency implementation." JA__[Op.18].

On February 16, 2017, this Court granted petitioners' petition for rehearing en banc. JA__[En.Banc.Order].

## STANDARD OF REVIEW

This Court reviews an agency's "resolution of constitutional questions de novo." *Venetian Casino Resort, L.L.C. v. NLRB*, 793 F.3d 85, 89 (D.C. Cir. 2015).

## SUMMARY OF ARGUMENT

For over a century, federal agencies have made use of hearing examiners to assist in compiling the administrative record and in making initial findings and determinations, and the SEC has employed hearing examiners, comparable to today's ALJs, virtually since its creation.

Now, as then, these personnel assist the Commission in its adjudicative responsibilities. The Commission may take over the proceeding itself at any time, reopen the record to hear additional evidence on any question, and revisit de novo any ruling of fact or law previously made. The ultimate decision-making authority remains with the Commission at all times: as the panel recognized, the Commission's ALJs do not have "authority to act independently of the Commission" and they lack "power to bind third parties, or the government itself." JA__[Op.13].

These limitations on the powers of the Commission's ALJs reflect the principles underlying the role of the hearing examiner that were codified in the Administrative Procedure Act. As the Supreme Court explained in *Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128 (1953), Congress retained examiners as

"classified Civil Service employees," *id.* at 133, to provide non-political support for the administrative process, *see id.* at 142. In the intervening decades, Congress changed the name of hearing examiners to "administrative law judges" and reassigned the oversight functions of the former Civil Service Commission to the Office of Personnel Management (OPM) and the Merit Systems Protection Board (MSPB). In all relevant respects, however, the regime reviewed by the Supreme Court in *Ramspeck* is unaltered, and the SEC has continued to employ ALJs as civil service employees who assist the politically accountable commissioners in the initial stages of administrative adjudications. The Commission's ALJs do not exercise any "significant authority pursuant to the laws of the United States" in their own right. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). They are, instead, "lesser functionaries subordinate to" the Commission, which retains the ultimate decision-making power in all cases and is solely responsible for its decisions. *Id.* at 126 n.162; *see Edmond v. United States*, 520 U.S. 651, 663 (1997) (emphasizing that the Appointments Clause is "designed to preserve political accountability relative to important Government assignments").

Nothing in the APA or in the SEC's organic statutes suggests that Congress believed that ALJs generally, or the Commission's ALJs in particular, are constitutional Officers. And petitioners identify no principled basis for setting aside the judgment of Congress, the understanding and reasoning of the Commission, and many decades of administrative practice, all of which confirm that the Commission's ALJs are employees.

The panel correctly concluded that, insofar as *Freytag v. Commissioner*, 501 U.S. 868 (1991), provides guidance here, the decision underscores that the Commission's ALJs, like the FDIC's ALJs at issue in *Landry,* are not constitutional Officers. Petitioners' reliance on aspects of the Supreme Court's discussion in *Freytag* mistakenly equates the Commission's ALJs to judges in an Article I court. *See also Bandimere v. SEC*, 844 F.3d 1168, 1179-82 (10th Cir. 2016), *petition for reh'g filed*, No. 15-9586 (Mar. 13, 2017). Petitioners disregard the critical differences between federal judges, including the special trial judges of the Tax Court, who issue enforceable decisions in their own right and the civil service employees who assist in an adjudicatory process that culminates in final decisions by the agency heads.

## ARGUMENT

### THE COMMISSION'S ALJS ARE CIVIL SERVICE EMPLOYEES OF THE COMMISSION, NOT OFFICERS OF THE UNITED STATES

#### A. The Commission employs ALJs as aides to the Commission's adjudicative functions, retaining all authority in the Commission itself.

The securities laws vest the adjudicative powers of the Securities and Exchange Commission exclusively in the Commission itself as a five-member body, whose members are appointed by the President with the advice and consent of the Senate. 15 U.S.C. § 78d(a). The Commission alone has the authority to interpret and apply the securities laws, issue regulations, find violations, and impose remedies in administrative proceedings.

Congress gave the Commission broad authority to make use of its personnel in exercising its functions: the Commission may employ "a division of the Commission, an individual Commissioner, an administrative law judge, or an employee or employee board." 15 U.S.C. § 78d-1(a). In all cases, however, the Commission retains the "discretionary right to review the action of any such division of the Commission, individual Commissioner, administrative law judge, employee, or employee board, upon its own initiative or upon petition of a party to or intervenor in such action[.]" *Id.* § 78d-1(b). As the panel explained, "[t]here can be no serious question that Section 78d-1(b) reserves to the Commission 'a discretionary right to review the action of any' ALJ as it sees fit." JA__[Op.12].

Consistent with that general grant of authority to delegate, the Commission has chosen to employ administrative law judges to assist in the adjudication of matters within the Commission. That practice is discretionary: Congress did not require the Commission to use ALJs at all and it vested the ALJs with no authority independent of the Commission. The Commission's regulations governing the assignment of matters to ALJs and the review of their initial decisions embody the Commission's judgment about how best to exercise the adjudicative powers that Congress vested in the Commission itself. Under those regulations, the Commission always retains the ultimate authority to exercise its adjudicative power.

Just as the Commission has discretion to decide whether to use ALJs at all, it also has discretion to determine precisely what role they play and what types of

questions they address. In practice, the Commission asks its ALJs to hold hearings and prepare initial decisions. But if it wished, the Commission could assign ALJs to prepare decisions only on questions of fact, but not law; or only on questions of liability, but not remedy; or merely to take and summarize oral testimony, without any findings or conclusions at all.

The Commission's regulations set out the mechanisms by which the Commission retains complete control over all cases. To aid the Commission, the ALJ receives evidence, rules on motions, and issues an initial decision on whether the securities laws have been violated. *See* 17 C.F.R. § 201.111. But the ALJ makes no final decisions in any part of the adjudication: all ALJ orders, findings, and legal conclusions are subject to review by the Commission at any time, and only the Commission may issue a final order. *See* JA__[SEC Op.29-31] (Commission explaining its authority and the role of ALJs). In no circumstance can an ALJ issue a decision that in any respect commits the Commission to a particular view of the law or facts, or in any other way inhibits the Commission's discretion to decide the case as the Commission itself prefers.

After an ALJ issues an initial decision, the respondent may petition the Commission for plenary review, and the Commission is unaware that it has ever denied a timely petition. *See* JA__[SEC Op.30]. Indeed, the Commission has eliminated any mechanism to oppose such petitions, because opposition would be "pointless." JA__[SEC Op.30 n.105]. Even if a respondent does not seek review, the

Commission can exercise its authority to conduct *sua sponte* plenary "review [of] a decision on [its] own initiative." *See* JA__[SEC Op.30] (citing 17 C.F.R. § 201.411(c)); *see also, e.g.*, *In re Dian Min Ma*, 2015 WL 2088438, at *1 (May 6, 2015) (Commission reviewing ALJ decision "on its own initiative," setting aside decision in part, and providing that "as modified," the initial decision "has become the final decision of the Commission"); *In re Michael Lee Mendenhall*, 2015 WL 1247374, at *1 (Mar. 19, 2015) (Commission "*sua sponte*" vacating initial decision and remanding for further proceedings); JA__[Remand Order 1-4] (remanding to the ALJ for additional factual findings in this case before the time to seek review of the ALJ's initial decision had expired). As the panel explained, "the Commission can always grant review on its own initiative, and so it must consider every initial decision, including those in which it does not order review." JA__[Op.15].[1]

The Commission's review of an ALJ's initial decision is de novo, and the Commission "may affirm, reverse, modify, [or] set aside" the decision "in whole or in part." 17 C.F.R. § 201.411(a); JA__[SEC Op.31]. The Commission need not defer to

---

[1] Petitioners mistakenly argue that respondents in Commission proceedings "may have to show clear error just to *receive* SEC review," Br. 28 (citing 17 C.F.R. § 201.411(b)(2)(ii)(A)), but fail to reference the Commission's declaration in the decision on review that it is unaware of ever having denied a timely petition for review. Instead, petitioners cite (Br. 28) *In re Bellows*, 1998 WL 611766 (Sept. 8, 1998), for the proposition that the Commission "has exercised [its] discretion to decline review." But in *Bellows*, the Commission denied a petition for review filed by its own Division of Enforcement, not by a respondent.

ALJ credibility determinations, and indeed, the Commission "will 'disregard explicit determinations of credibility' when [its] *de novo* review of the record as a whole convinces [it] that a witness's testimony is credible (or not)." JA__[SEC Op.32 n.117]; 17 C.F.R. § 201.411(a). If the Commission is dissatisfied in any respect with the ALJ's initial decision, it may—as it did in the proceeding on review—remand the case "for further proceedings," 17 C.F.R. § 201.411(a), or "remand . . . for the taking of additional evidence," *id.* § 201.452.

The Commission at all times retains plenary authority over the entire case, including all evidentiary and discovery-related rulings. JA__[SEC Op. 31]. Thus, the Commission itself "may make any findings or conclusions that in its judgment are proper and on the basis of the record." 17 C.F.R. § 201.411(a). And the Commission's authority is not limited to review of the record before an ALJ: the Commission may decide to expand the record and take new evidence, hear testimony itself from a particular witness, or open an entirely new line of inquiry. *Id.* § 201.452.

This case is illustrative. The ALJ issued an initial decision finding liability based only on one of the four charged misrepresentations. Before the time for seeking Commission review had run, the Commission asserted its authority and directed the ALJ to make findings on the three charges it had not addressed. *See* JA__[Op. 6-7]. The Commission's handling of this case underscores the extent of its control and the

function of the ALJ's initial decision as merely a foundation for the Commission's judgment.[2]

Even when no party files a timely petition for review and the Commission does not exercise its option to conduct plenary review *sua sponte*, "no initial decision becomes final simply 'on the lapse of time.'" JA__[SEC Op.31]. Instead, as the Commission explained here, it is "our issuance of a finality order" that makes an ALJ's decision "final and effective." JA__[SEC Op. 31 n.109] (citing 17 C.F.R. § 201.360(d)(2)). And only the Commission's finality order, not the initial decision, states "the date on which sanctions, if any, take effect." 17 C.F.R. § 201.360(d)(2). Although petitioners dismiss the finality order as "a pro forma, ministerial order" (Br. 28), the panel correctly noted that "the Commission has explained that the order plays a more critical role," JA__[Op.13]. "As the Commission has emphasized, the initial decision becomes final when, and only when, the Commission issues the finality order, and not before then. Thus, the Commission must affirmatively act—by issuing the order—in every case." JA__[Op.13] (internal citation omitted). The panel

---

2 In *In re Alchemy Ventures, Inc.*, 2013 WL 6173809 (Oct. 17, 2013), which petitioners cite (Br. 29, 38 n.3), the Commission expressly disapproved some ALJs' prior practice of issuing default orders in cases where a respondent defaults by, for example, failing to appear, and made clear that ALJs must in such cases issue initial decisions, which do not become the final agency decision unless the Commission itself so orders. *See In re Alchemy Ventures, Inc.*, 2013 WL 6173809, at *3-4 n.28 (citing 17 C.F.R. § 201.360(d)). The Commission declined to "disturb existing default orders, [or] limit the Division's ability to seek judicial enforcement of those orders." *Id.* at *4.

explained that whether the Commission issues "a new decision after *de novo* review or, by declining to grant or order review, . . . embrace[s] . . . the ALJ's initial decision as its own," the Commission itself "has retained full decision-making powers." JA__[Op.13].

Petitioners acknowledge (Br. 28) that under section 78d-1(c), the action of an employee or administrative law judge will be "deemed the action of the Commission," only if the Commission declines its "right to exercise such review." 15 U.S.C. § 78d-1(c). Thus, section 78d-1 does not create a presumption that any delegated action becomes final absent the Commission's decision not to exercise its right of review. As the panel explained, "even when there is not full review by the Commission, it is the act of issuing the finality order that makes the initial decision the action of the Commission within the meaning of the delegation statute." JA__[Op.13].

### B. The Commission's use of its ALJs reflects its own longstanding practice and the model of administrative adjudication codified in the APA.

The Commission's use of its ALJs is rooted in its practice dating back to the 1930s, and it exemplifies the model of administrative adjudication adopted by Congress in enacting the APA. Under that model, civil service employees, hired on the basis of merit and protected from retaliation for their decisions, assist agencies in performing their adjudicatory functions under law, but all decision-making authority on questions of both fact and law resides in the politically accountable agency head. Petitioners' insistence that Congress created constitutional Officers in the APA or in

the relevant provisions of the securities laws finds no support in those statutes or in the Commission's practice.

**1.** Federal employees, comparable to today's ALJs, but originally known as "examiners" or "hearing examiners," have assisted federal agencies by developing administrative records and making initial findings and determinations since the turn of the twentieth century. *See, e.g.*, Act of June 29, 1906, ch. 3951, sec. 7, § 20, 34 Stat. 584, 595 (authorizing the Interstate Commerce Commission to use "special agents or examiners"). These employees were vital in carrying out the agency's day-to-day tasks, since it was a "reality that many persons in the agency other than the heads must do the bulk of this work." *Administrative Procedure in Government Agencies*, S. Doc. No. 77-8, at 21 (1941) (*Attorney General's Report*); *id.* at 314 (app. F).

The Securities and Exchange Commission's examiners, for example, ruled on evidentiary motions, issued subpoenas, and "file[d] a report containing . . . findings of fact." *Attorney General's Report* 395-96 (app. H).[3] The Commission regarded the hearing examiner's report "as advisory only," and would "ordinarily attach[] little weight to it." *Id.* at 396.

Before the enactment of the APA, most hearing examiners lacked civil service protections, but nearly all were subject to classification and salary regulation by the

[3] Initially, the Commission's rules did not "permit inclusion of conclusions of law or recommendations in the report, although they d[id] sometimes appear." *Attorney General's Report* 396 (app. H).

Civil Service Commission. *Attorney General's Report* 375 (app. H); *see generally Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128, 130-31 (1953). As the use of hearing examiners grew, concerns arose regarding the extent to which their decisions were influenced by a desire to please the agency leadership that controlled their promotion. *See Ramspeck*, 345 U.S. at 131. These concerns were exacerbated by the fact that, in many agencies, the same individuals were "obliged to serve both as prosecutors and as judges," an arrangement that "not only undermines judicial fairness; it weakens public confidence in that fairness." President's Comm. on Admin. Mgmt., *Administrative Management in the Government of the United States* 36 (1937).

**2.** In enacting the APA, Congress considered several competing proposals designed to address those issues—proposals with significantly different implications for the roles of the officials in charge of an agency and for the persons performing the traditional role of hearing examiner. For example, Congress considered a "proposal for the creation of an administrative court." H.R. Rep. No. 79-1980, at 8 (1946). This proposal would have removed the adjudicatory function from agencies and established "a single administrative court which would hear cases for all agencies." *Ramspeck v. Federal Trial Exam'rs Conference*, 202 F.2d 312, 314 n.21 (D.C. Cir. 1952) (Bazelon, J., dissenting), *rev'd*, 345 U.S. 128 (1953). That administrative court would have been a full Article I "court of record" akin to the Court of Federal Claims or the Tax Court, with the power to call on the U.S. Marshals to enforce its orders, and its

judges would have been constitutional officers, appointed by the President and confirmed by the Senate.[4]

As the panel recognized, "Congress considered and rejected proposals to transfer final decision-making authority from agency officials to presidentially appointed judges in a separate administrative court with powers similar to those generally vested in Article I courts." JA__[Op.17]. Congress thus did not make hearing examiners into constitutional officers in a court of record. Instead, Congress heeded the recommendation of the American Bar Association and others to place "trial examiners, and other similar employees" in the civil service and to prevent political appointments to these positions. *Administrative Procedure: Hearings Before a Subcomm. of the S. Comm. on the Judiciary*, 77th Cong. 250, 876, 1000 (1941). The Securities and Exchange Commission endorsed "merit selection" for its examiners, explaining that they did not need to be "under the 'control' of the agency." *Id.* at 397. The Commission stressed, however, that it must "retain full control as to law and policy applicable to the final decision." *Id.*

Congress endorsed that approach in the APA. In section 11 of the Act, Congress provided that examiners would be "appointed by and for each agency" in accordance with "the civil-service and other laws," and that examiners could be

4 *See* S. 5154, 70th Cong. (1929); S. 1835, 73d Cong. (1933) (same); S. 3787, 74th Cong. (1936) (similar proposal); Special Comm. on Admin. Law, Am. Bar Ass'n, *1934 ABA Annual Report* 539 (1934).

removed "only for good cause established and determined by the Civil Service Commission[.]" Administrative Procedure Act, ch. 324, § 11, 60 Stat. 237, 244 (1946) (codified as amended at 5 U.S.C. § 3105). To address concerns about decisional independence, Congress transferred responsibility for rating and promoting examiners to the Civil Service Commission. Thus examiners were "given independence and tenure within the existing Civil Service system," but with "control of their compensation, promotion, and tenure [vested] in the Civil Service Commission to a much greater extent than in the case of other federal employees." *Ramspeck*, 345 U.S. at 131-32.

*Ramspeck*, which was decided in the wake of the APA's enactment, involved a challenge brought by a group of examiners to the Civil Service Commission's regulations governing the classification, promotion, assignment, and furlough of examiners under the APA. 345 U.S. at 129-30. The Supreme Court rejected contentions that Congress had not intended to subject examiners to the same sort of salary classifications and furlough rules that governed other federal employees, and upheld several Civil Service Commission regulations governing the examiners. These included regulations that gave the Civil Service Commission authority to classify cases by difficulty; to classify examiners into grades within an agency; and to assign examiners who were, according to their classification, qualified to handle the case at hand. *Id.* at 134. The Supreme Court held that the Civil Service Commission had "carr[ied] out the purpose and intent of Congress" in providing for merit selection

and civil service protection of examiners as "Civil Service employees." *Id.* at 133, 143; *see generally Bush v. Lucas*, 462 U.S. 367, 381-86 (1983) (discussing history of civil service protections, which guard against "politically-motivated removals").

The APA structure makes clear that, as employees, ALJs function to assist—but not to bind—politically accountable agency heads in the exercise of their adjudicative powers. Thus, as this Court has stressed, the APA provides that "'[o]n appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision,'" and, even "[o]n questions of facts, an agency reviewing an ALJ decision is not in a position analogous to a court of appeals reviewing a case tried to a district court." *Kay v. FCC*, 396 F.3d 1184, 1189 (D.C. Cir. 2005) (quoting 5 U.S.C. § 557(b)). The 1947 *Attorney General's Manual* explained that Congress included this provision to make clear that examiners' "initial decision[s]" would "in no way b[i]nd" an agency, and that the agency would retain "complete freedom of decision—as though it had heard the evidence itself." *Attorney General's Manual* 83.[5] Then-professor Antonin Scalia described the APA's model of administrative adjudication in 1979: examiners were "entirely subject to the agency on matters of law; they can be reversed by the agency on matters of fact, even where

[5] As "a contemporaneous interpretation [of the APA]," *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 546 (1978), the *Attorney General's Manual* is "given 'considerable weight,'" in interpreting the APA's provisions, *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986).

demeanor evidence is an important factor; and they can always be displaced, if the agency wishes, by providing for hearing before the agency itself or one of its members." Antonin Scalia, *The ALJ Fiasco—A Reprise*, 47 U. Chi. L. Rev. 57, 62 (1979).[6]

The fundamentally subordinate role that Congress established for ALJs in the APA remains unchanged. In 1978, Congress changed the name "hearing examiner" to "administrative law judge," Act of March 27, 1978, Pub. L. No. 95-251, § 2, 92 Stat. 183, and divided the duties of the former Civil Service Commission between OPM and the MSPB, *see* Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111. OPM now performs the function of examining and vetting ALJ candidates, *see* 5 U.S.C. § 1104(a)(2); 5 C.F.R. § 930.201(d)-(e), while the MSPB determines if good cause exists for an agency to remove an ALJ, *see* 5 U.S.C. § 7521. But ALJs remain "classified Civil Service employees" of the agencies where they work, exactly as they were when the Supreme Court first considered their status in 1953. *Ramspeck*, 345 U.S. at 133; *see Mahoney v. Donovan*, 721 F.3d 633, 634-35 (D.C. Cir. 2013) (explaining that although ALJs "are agency employees," OPM and MSPB control certain aspects of their employment). Indeed, a number of ALJs, like other federal employees, have

6 The article's title referred to an unsuccessful attempt in the 1940s to remove many hearing examiners, and a renewed attempt to reform ALJ selection and promotion. Professor Scalia advocated developing a multi-grade structure within the civil service for ALJ evaluation and promotion. *See generally* 47 U. Chi. L. Rev. at 57-58, 75-80.

exercised their right to unionize in order to seek redress of their grievances from agency employers. *See, e.g.*, *Association of Admin. Law Judges v. Colvin*, 777 F.3d 402, 403 (7th Cir. 2015) (addressing an APA challenge brought by a union of ALJs in the Social Security Administration).

That ALJs function as employees does not diminish the value of their work. But it does not follow that ALJs are "Officers" under the Appointments Clause merely because they serve a valuable function in the Commission's administrative process. It is "an everyday occurrence in the operation of government" that employees propose policies and actions "for which duly appointed or elected officials take official responsibility. Our government in fact depends on such delegation of responsibility, and it does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action." *Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987); *see also Tucker v. Commissioner*, 676 F.3d 1129, 1133 (D.C. Cir. 2012) (recognizing that the power to render final decisions is one of "the main criteria for drawing the line between inferior Officers and employees").

### C. Petitioners fundamentally err in analogizing ALJs to judges in military, Article I, and Article III courts.

**1.** Petitioners chiefly rely on one portion of the Supreme Court's decision in *Freytag v. Commissioner*, 501 U.S. 868 (1991), which held that the special trial judges of the Tax Court were inferior Officers, *id.* at 880-83. As this Court has explained, "the

main criteria for drawing the line between inferior Officers and employees not covered by the Clause are (1) the significance of the matters resolved by the officials, (2) the discretion they exercise in reaching their decisions, and (3) the finality of those decisions." *Tucker*, 676 F.3d at 1133.[7] The panel correctly held that while the special trial judges fall on the Officer side of that line, ALJs do not.

Petitioners argue that the authority exercised by the Commission's ALJs "mirrors—and in some ways, exceeds—that of the special trial judges in *Freytag*." Br. 30; *see also Bandimere v. SEC*, 844 F.3d 1168, 1179-80 (10th Cir. 2016). That argument fundamentally misunderstands the powers of ALJs and the nature of the Tax Court and its special trial judges, who were authorized by Congress to exercise "a portion of the judicial power of the United States" in a manner that invested them with different and greater authority than intra-agency adjudicators like the Commission's ALJs. *See Freytag*, 501 U.S. at 891; JA__[Op.9] (explaining that special trial judges "could exercise the judicial power of the United States").

The Tax Court was originally established as the Board of Tax Appeals, an independent agency that adjudicated disputed tax assessments. Revenue Act of 1924,

---

[7] The Court in *Tucker* explained that the "effective finality" of employees' decisions does not make them inferior officers where, for example, those employees' decision-making discretion is "highly constrained." *Tucker*, 676 F.3d at 1134 (holding that employees of the Internal Revenue Service's Office of Appeals are not inferior officers notwithstanding their authority to determine individuals' tax liability because their decision-making process "is subject to consultation requirements, to guidelines, and to supervision").

ch. 234, § 900(a), (k), 43 Stat. 253, 336, 338. The Board could "designate an attorney from the legal staff" to "act as a commissioner in a particular case," Revenue Act of 1943, ch. 63, § 503, 58 Stat. 21, 72 (1944), but a commissioner could not enter any final orders on the Board's behalf.

In the period leading up to *Freytag*, Congress re-established the Board as the Article I Tax Court with the same power to enforce its orders "as is available to a court of the United States." Tax Reform Act of 1969, Pub. L. No. 91-172, §§ 951, 956, 83 Stat. 487, 730, 732. Congress also re-named commissioners as "special trial judges" and enlarged their powers, permitting them to issue final and enforceable judgments on behalf of the Tax Court in specified classes of cases. *See, e.g.*, Deficit Reduction Act of 1984, Pub. L. No. 98-369, div. A, tit. IV, subtit. E, §§ 463-464, 98 Stat. 494, 824.[8]

Congress's transformation of the Board into an Article I "court of record"—empowered like any other federal court to issue final, executable judgments—significantly expanded its authority. Prior to *Freytag,* the Tax Court itself had already concluded that this transformation in status, together with the enhanced power of special trial judges, meant that special trial judges were "Officers" under the Constitution: "Because special trial judges may be assigned any case and may enter

---

8 The substantive effects of these amendments were summarized by former Solicitor General Griswold's amicus brief, 1991 WL 11007939, at *2-4, which the *Freytag* Court cited in its opinion, 501 U.S. at 884, 888.

decisions in certain cases, it follows that special trial judges exercise significant authority" and "are officers." *First W. Gov. Securities, Inc. v. Commissioner*, 94 T.C. 549, 557 (1990).

The government in *Freytag* did not dispute the point and "concede[d] that … special trial judges act as inferior officers" in most cases. *Freytag*, 501 U.S. at 882. The government argued, however, that the special trial judge in *Freytag* was not acting as an inferior officer *in the specific case at issue* because he could not enter a final decision in that particular category of case. U.S. Br. 7-8, *Freytag v. Commissioner*, No. 90-762, 1991 WL 11007941 (Apr. 3, 1991). The Supreme Court disagreed, declaring that "[s]pecial trial judges are not inferior officers for purposes of some of their duties . . . but mere employees with respect to other responsibilities." *Freytag*, 501 U.S. at 882. The Court also emphasized that special trial judges held positions "established by law," adjudicated tax disputes, and "perform[ed] more than ministerial tasks" in those adjudications: "[t]hey take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Id.* at 881-82. Accordingly, the Supreme Court agreed with the Tax Court that its special trial judges were constitutional officers. *Id.* at 881 (citing *First W. Gov. Securities, Inc.,* 94 T.C. at 557). The Court concluded that the special trial judges were properly appointed because the Tax Court was a "Court[] of Law" under the Appointments Clause, emphasizing that the Tax Court exercised "a portion of the judicial power of the United States." *Id.* at 891.

**2.** The Supreme Court's ruling in *Freytag*, in short, dealt with Article I judges who exercised "a portion of the judicial power of the United States" and were concededly Officers in many categories of cases. The Court's decision does not mean that administrative law judges are likewise constitutional Officers.

As an initial matter, although petitioners argue that the special trial judges' authority to enter final decisions was not critical to the holding in *Freytag* (Br. 21-22, 37-43), that authority was a predicate to the Court's holding that "[i]f a special trial judge is an inferior officer for" some purposes, then "he is an inferior officer." 501 U.S. at 882. Petitioners mistakenly declare that "*Freytag* expressly rejected the contention that lack of power to make final decisions takes officials outside the Appointments Clause." Br. 39. It was uncontested in *Freytag* that the Tax Court's special trial judges could and did issue final decisions in the exercise of their judicial powers and that they were constitutional Officers in those cases. The Supreme Court rejected the proposition that the special trial judge was an Officer in some cases but ceased to be an officer when he performed duties that might also have been performed by an employee. That the special trial judge could not enter final decisions in one class of cases was "beside the point" because "[t]he fact that an inferior officer on occasion performs duties that may be performed by an employee not subject to the Appointments Clause," *i.e.,* proposing non-final decisions subject to a Tax Court judge's plenary review, "does not transform his status under the Constitution."

*Freytag,* 501 U.S. at 882. The Court had no reason in *Freytag* to address the status of personnel who do not bind the government in any class of cases.

**3.** Petitioners alternatively argue (Br. 25-31) that ALJs perform functions similar to those of the special trial judges in *Freytag.* The Supreme Court explained that in all cases the judges "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Freytag*, 501 U.S. at 881-82. The Court noted, in other words, that the special trial judges preside over proceedings in an Article I court even in the cases in which they do not enter final decisions for the Tax Court.

The Court did not thereby suggest that any federal employee who presides over a hearing must be appointed under the methods prescribed by the Appointments Clause. Special trial judges exercise a portion of the judicial power. Among other powers, the Supreme Court noted that they have "the power to enforce compliance with discovery orders." *Freytag*, 501 U.S. at 882; *see also id.* at 891 (noting that the Tax Court "has authority to punish contempts by fine or imprisonment" in holding that the Tax Court is a "Court[ ]of Law" under the Appointments Clause); *Ryan v. Commissioner*, 67 T.C. 212, 223 (1976) (punishing criminal contempt); *Aaronson v. Commissioner*, T.C. Mem. 1985-131 (1985) (special trial judge declining to impose contempt sanctions). If a party refuses to comply with an order, the Tax Court "shall have such assistance" from the U.S. Marshals in carrying out its orders "as is available to a court of the United States." 26 U.S.C. § 7456(c). Thus, the Tax Court may call

upon the U.S. Marshals to seize and imprison a contemptuous party, or to assist the court in collecting a punitive fine. 28 U.S.C. § 566(a) (Marshals shall "obey, execute, and enforce all orders of . . . the United States Tax Court"). And as a court "established by Act of Congress," the Tax Court may use its contempt power to enforce any order it may issue under the All Writs Act. *Id.* § 1651(a). Other Article I courts have similar contempt powers. *See id.* § 2521 (Court of Federal Claims); 38 U.S.C. § 7265 (Court of Appeals for Veterans Claims); D.C. Code §§ 11-741, 11-944 (D.C. courts).

Administrative law judges—unlike judges of Article I courts, military judges, magistrate judges, and other adjudicative officers to whom petitioners repeatedly compare ALJs—have no authority to issue contempt sanctions for noncompliance. *Cf. ICC v. Brimson*, 154 U.S. 447, 488-89 (1894) (courts, not agencies, possess the contempt power). In the face of "[c]ontemptuous conduct," an SEC ALJ may only exclude the person from the room or suspend a contemptuous attorney from representing a party, 17 C.F.R. § 201.180(a)(1), and even that order is subject to immediate de novo Commission review, *id.* § 201.180(a)(2). Likewise, although the Commission's ALJs may issue subpoenas for evidence, *id.* § 200.14(a)(2), they cannot enforce their own subpoenas or even seek such enforcement. Instead, "[t]he Commission itself would need to seek an order from a federal district court to compel compliance." JA__[SEC Op.33 n.120]; *see also* 15 U.S.C. § 78u(e).

Petitioners recognize that the Commission's ALJs "lack[] the authority to punish disobedience of discovery and other orders with contempt sanctions," but they question why the contempt power "should be pivotal to an official's status under the Appointments Clause." Br. 30. The power of contempt is a hallmark of an adjudicative official's status as a constitutional officer. Contempt is the power to demand immediate obedience to judicial orders, without the need for authorization by any other federal officer. "[C]ourts have the inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). As the Supreme Court has long recognized, the existence of the contempt power is "essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 510 (1874). And the Supreme Court in *Freytag* clearly assigned significance to this authority when it explained that the special trial judges "have the power to enforce compliance with discovery orders." 501 U.S. at 881-82.

**4.** Expanding on their mistaken analogy to the judges of an Article I court of record, petitioners argue more broadly that ALJs are among "[f]ederal adjudicators—who by definition wield the power of federal law to sanction transgressors"—and should therefore be subject to the requirements of the Appointments Clause. Br. 20. But the Commission's ALJs do not sanction transgressors. Petitioners do not contend, for example, that they were sanctioned by the ALJ in their case. As they

recognize, they were sanctioned by the Commission, and they sought review of the Commission's order, not the ALJ's initial decision.

Petitioners fundamentally err in analogizing agency adjudications to the very different paradigm of federal district court actions. Br. 29-30. A district court is not exercising a portion of the court of appeals' power that has been assigned to it in a particular case, subject to the court of appeals withdrawing the assignment at any time and issuing its own decision. A district court exercises the authority vested in it by Congress to hear and decide cases. *See, e.g.*, 28 U.S.C. § 1331 (vesting district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"); 18 U.S.C. § 3231 (vesting district courts with original jurisdiction "of all offenses against the laws of the United States"). And a district court's decision is a decision "of the district court[]," 28 U.S.C. § 1291, not a decision of the court of appeals. Congress separately vested the courts of appeals with "jurisdiction of appeals from all *final decisions of the district courts* of the United States." *Id.* (emphasis added).

The relationship between an ALJ and the Commission differs fundamentally from that of a trial court and a court of appeals. An ALJ has no authority to hold hearings and issue an initial decision in an administrative proceeding independent of an assignment from the Commission. Although the Commission typically assigns its proceedings to ALJs for an initial decision, that is only because the Commission has elected to structure its processes in that way. The Commission is free under the

securities laws to use its ALJs in any manner it wishes: the Commission could assign an ALJ to address only certain issues in a case or decide not to use an ALJ at all. And any ALJ decision is simply a predicate for a decision of the Commission, whether the Commission grants review and issues an opinion or decides to adopt the ALJ's decision as its own. Congress vested the relevant authority in the Commission, and it is only a decision of the Commission that binds a respondent and is reviewable in the courts of appeals.

Nor do the Commission's ALJs have the critical powers of the U.S. commissioners (now known as magistrate judges) at issue in *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 352-53 & n.2 (1931). U.S. commissioners had authority to "arrest and imprison" defendants, to "issue warrants for" fugitives, to "issue search warrants," to "take bail," to "discharge poor convicts imprisoned for non-payment of fines," and to "institute prosecutions under laws relating to the elective franchise and civil rights." *Id.* at 353 n.2. Magistrates may also enter final, binding orders in certain classes of cases, 28 U.S.C. § 636(c)(1), and a district court cannot review a magistrate judge's decisions on dispositive motions, trial orders, or the entry of final judgment in such cases. *Roell v. Withrow*, 538 U.S. 580, 585 (2003); 28 U.S.C. § 636(c)(3). Moreover, a magistrate judge may enforce such orders and others through the contempt power, and may summarily order imprisonment or a fine. 28 U.S.C. § 636(e). Magistrates also exercise significant additional authority in their own right under federal statutes: they may issue arrest warrants, 18 U.S.C. § 3041; authorize

criminal complaints, Fed. R. Crim. P. 3; order pre-trial detention, 18 U.S.C. §§ 3141(a), 3142(a)(4); detain material witnesses, 18 U.S.C. § 3144; try misdemeanor cases, 18 U.S.C. § 3401(a); impose sentences for petty offenses without the parties' consent, 28 U.S.C. § 636(a)(4); and certify a person for extradition in an order that is not subject to direct review, *Munoz Santos v. Thomas*, 830 F.3d 987, 1000-01 (9th Cir. 2016) (en banc) (citing 18 U.S.C. § 3184); *see also Go-Bart*, 282 U.S. at 353 n.2 (describing similar duties).

Petitioners' attempt to analogize the Commission's ALJs to judges of the intermediate court of military appeals held to be inferior officers in *Edmond v. United States*, 520 U.S. 651, 661-65 (1997), is similarly unavailing. It was undisputed that these judges exercised "significant authority on behalf of the United States," *Edmond*, 520 U.S. at 662—authority without counterpart in an ALJ's powers. Military court judges may punish any person who "willfully disobeys" the court's lawful order by "confinement for 30 days, a fine of $1,000, or both." 10 U.S.C. § 848(a)(3), (b). A general court-martial may consist of a single military judge, who may convict the defendant and "impose any lawful sentence," including a decades-long term of confinement. *Weiss v. United States*, 510 U.S. 163, 167 (1994). A military judge may also preside over a court-martial that imposes capital punishment. 10 U.S.C. § 816(1)(A). The judges on the intermediate court of military appeals "review all cases in which the sentence imposed" exceeds one year of confinement, "involves the dismissal of a commissioned officer, or involves the punitive discharge of an enlisted

servicemember." *Weiss*, 510 U.S. at 168. In so doing, they "may review *de novo* both factual and legal findings." *Id.* These powers were not sufficient, however, to make the military judges principal officers as urged by the petitioner in that case.

Petitioners identify no authority exercised by the Commission's ALJs that is remotely comparable to the authority exercised by the military judges. And they appear to recognize that the intermediate military judges issue final decisions subject only to discretionary review. Br. 44-45. Review by the Court of Appeals for the Armed Forces (the highest military court) is discretionary except in capital cases or in cases in which review is ordered by the Judge Advocate General. 10 U.S.C. § 867(a). The intermediate court judges thus issue final decisions in cases involving significant criminal sentences—again, an authority without counterpart in the powers of the Commission's ALJs.

### D. Petitioners' Other Arguments Are Similarly Without Merit.

**1.** Petitioners do not advance their argument by mistakenly asserting that "all three branches have recognized that ALJs are officers." Br. 31 (capitalization altered).

First, petitioners' contention that Congress has recognized that ALJs are officers is inconsistent with the hearing examiner model that Congress established in the APA, which classifies ALJs as "Civil Service employees." *Ramspeck*, 345 U.S. at 133; *see supra* Part B.2. Petitioners note that "[t]he securities laws *refer* to ALJs as 'officers.'" Br. 31. As the panel correctly observed, however, petitioners "point to the reference to 'officers of the Commission' in 15 U.S.C. § 77u, but there is no

indication that Congress intended these officers to be synonymous with 'Officers of the United States' under the Appointments Clause." JA__[Op.18]. Indeed, the APA "consistently uses the term 'officer' or the term 'officer, employee, or agent'" to "refer to [agency] staff members." Kenneth Culp Davis, *Separation of Functions in Administrative Agencies*, 61 Harv. L. Rev. 612, 615 & n.11 (1948); *cf. Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 485-86 (2010) (noting that "[d]espite the provisions specifying that Board members are not Government officials for statutory purposes, the parties agree that . . . its members are Officers of the United States" for constitutional purposes (quotation marks omitted)).

Petitioners similarly err in their assertion that Congress intended "presiding officer" in the APA to be synonymous with a constitutional Officer because it amended the APA to define an "officer" as, *inter alia*, an individual appointed by "the head of an Executive agency." Br. 32 (emphasis omitted) (quoting 5 U.S.C. § 2104(a)(1)(C)). But as with Congress's provision for the appointment of ALJs "by and for each agency," 60 Stat. at 244 (codified as amended at 5 U.S.C. § 3105), appointment by the head of an agency does not mirror the constitutional requirement for appointment of inferior officers by "the Heads of Departments," U.S. Const., art. II, § 2, cl. 2. Petitioners' argument that the ALJs are inferior officers because of the "direct relation[ship]" (Br. 32) between ALJs and the Commission has no doctrinal foundation and disregards the fact that the statutory provision authorizing use of

ALJs applies equally to employees assisting the Commission in carrying out a broad variety of functions. 15 U.S.C. § 78d-1(a), (c).

Second, the 2007 opinion of the Office of Legal Counsel (OLC) on which petitioners heavily rely makes clear that "a federal office involves a position to which is delegated by legal authority a portion of the sovereign powers of the federal government" and "[s]uch powers primarily involve binding the government or third parties for the benefit of the public." *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 77 (2007); *see also id.* at 87 ("As a general matter, . . . one could define delegated sovereign authority as power lawfully conferred by the government to bind third parties, or the government itself, for the public benefit."). As the panel correctly held, and as explained above, "the Commission's ALJs neither have been delegated sovereign authority to act independently of the Commission nor, by other means established by Congress, do they have the power to bind third parties, or the government itself, for the public benefit." JA__[Op.13] (citing 31 Op. O.L.C. at 87). Petitioners note (Br. 34) that the 2007 OLC opinion does not require an officer to have "some sort of 'independent discretion' in carrying out sovereign functions." 31 Op. O.L.C. at 95. But the opinion makes clear that officers have the legal power to "bind the rights of others," which is "in contrast with a person whose acts have no authority and power of a public act or law absent the subsequent sanction of an officer or the legislature." *Id.* (quotation marks omitted).

Petitioners likewise err in asserting that in a 1991 opinion OLC "opined that ALJs with similar functions to SEC ALJs are inferior officers." Br. 34 (citing *Secretary of Education Review of Administrative Law Judge Decisions*, 15 Op. O.L.C. 8, 14 (1991)). As an initial matter, in a separate opinion that petitioners do not cite, OLC made clear that the Department of Education's ALJs are "employees of the Department." *Authority of Education Department Administrative Law Judges in Conducting Hearings*, 14 Op. O.L.C. 1, 1 (1990). OLC explained that "[a]dministrative law judges have no constitutionally based judicial power, but are employees of the executive branch department or agency employing them." *Id.* at 2 (citation omitted). "ALJs thus do not exercise the broadly independent authority of an Article III judge, but rather operate as subordinate executive branch officials who perform quasi-judicial functions within their agencies." *Id.* The 1991 opinion that petitioners rely on addressed the role of Department of Education ALJs in light of statutory changes, which provided that the decision of an ALJ to terminate funds in certain cases "shall be considered to be a final agency action." *See* 15 Op. O.L.C. at 9. OLC explained that reading the statute to allow ALJs to issue decisions that "could not be reviewed by the Secretary," *id.* at 14, would raise Appointments Clause concerns because the ALJ "would appear to be acting as a principal officer"—but since that statutory reading was incorrect, OLC did not opine on ALJs' status as officers. *Id.*

Third, petitioners mistakenly rely on *Butz v. Economou*, 438 U.S. 478 (1978), for the proposition that the judicial branch has recognized that ALJs are officers akin to

federal district court judges. *Butz* has no bearing on the issues presented here. *Butz* held that agency ALJs, officials, and attorneys were entitled to absolute immunity for their actions in agency adjudications. 438 U.S. at 512-17; *see also* 14 Op. O.L.C. at 4 (distinguishing *Butz* and explaining that, in the context of an immunity analysis, *Butz* held that an ALJ "is 'functionally comparable' to an Article III judge, who enjoys absolute immunity"). The Court said nothing about the Appointments Clause either directly or by implication. Moreover, as the Supreme Court explained in *Ramspeck*, administrative law judges are "classified Civil Service employees." 345 U.S. at 133; *see also id.* 143 n.9 (rejecting argument that letter suggesting "[i]t was intended that (examiners) be very nearly the equivalent of judges" was "illustrative of the intent of Congress at the time it passed the [APA]").

Finally, petitioners rely on the Tenth Circuit's decision in *Bandimere* to support their proposition that the judicial branch agrees that ALJs are officers. Br. 35-36 (citing *Bandimere*, 844 F.3d 1168). The *Bandimere* majority disagreed with the unanimous panel in this case and held that the Commission's ALJs are inferior officers. The Commission has sought rehearing en banc of the decision in *Bandimere*. And the district court opinions that petitioners cite (Br. 36), which were vacated because the district courts lacked jurisdiction to consider the constitutional question, provide no support for petitioners' sweeping assertion about the view of the judiciary on this question.

**2.** Petitioners also cite (Br. 19) 19th-century Supreme Court cases characterizing various government actors as inferior officers. But as this Court correctly recognized in *Landry v. FDIC*, 204 F.3d 1125, 1132-33 (D.C. Cir. 2000), "the earliest Appointments Clause cases often employed circular logic." Those cases provide a poor compass for modern Appointments Clause analysis because the Supreme Court at that time generally determined whether an official was an officer of the United States by looking to the prescribed manner of appointment, without any separate inquiry into whether the official exercised significant authority under federal law. *See, e.g.*, *United States v. Mouat*, 124 U.S. 303, 307 (1888) ("Unless a person … holds his place by virtue of an appointment by the President, or of one of the courts of justice or heads of departments authorized by law to make such an appointment, he is not, strictly speaking, an officer of the United States."); Edward Susolik, Note, *Separation of Powers and Liberty: The Appointments Clause,* Morrison v. Olson*, and Rule of Law*, 63 S. Cal. L. Rev. 1515, 1545 (1990) (these early cases "posit conclusions rather than arguments and provide little insight"). Petitioners do not advocate that mode of analysis, under which the Court would accept Congress's determination that ALJs need not be appointed as constitutional officers.

### E. The Court In *Landry* Correctly Held That The ALJs In That Case Were Not Constitutional Officers.

For all of the reasons discussed above, petitioners present no persuasive reason to overrule this Court's decision in *Landry*. The Commission's limitations on the

authority of its ALJs are materially identical to the limitations on the authority of the FDIC's ALJs. As the panel concluded, "[b]ased on the Commission's interpretation of its delegation scheme, the difference between the FDIC's recommended decisions and the Commission's initial decisions is illusory." JA__[Op.15] (quotation marks omitted). And as the panel explained, petitioners are incorrect to assert (Br. 49-51) that Commission ALJs otherwise "exercise greater authority than FDIC ALJs": "the Commission's scope of review is no more deferential than that of the FDIC Board." JA__[Op. 16].

* * *

For over a century, ALJs and their administrative predecessors have functioned as employees of agencies. Since virtually the creation of the SEC, they have worked as aides to the Commission, which itself retains final authority and political accountability. As the Supreme Court has stressed, such a "'[l]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions' regulating the relationship between Congress and the President." *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559-60 (2014) (quoting *The Pocket Veto Cas*e, 279 U.S. 655, 689 (1929)). The long history of using hearing examiners and ALJs has resulted in no apparent detriment to the proper assertion of authority within the executive branch. And here, the Commission's regulations and practices leave the public in no doubt "where the buck stops" for Commission decisions—with the

politically accountable Commissioners themselves. *Bandimere*, 844 F.3d at 1198 (McKay, J., dissenting).

## CONCLUSION

The Commission's order should be affirmed.

Respectfully submitted,


CHAD A. READLER
Acting Assistant Attorney General

MARK B. STERN
MARK R. FREEMAN
MELISSA N. PATTERSON
/s/ *Megan Barbero*
MEGAN BARBERO
DANIEL AGUILAR
TYCE R. WALTERS
(202) 532-4631

Attorneys, Appellate Staff
Civil Division, Room 7226
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

MICHAEL A. CONLEY
Solicitor

DOMINICK V. FREDA
Assistant General Counsel

MARTIN V. TOTARO
Senior Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-7962 (Totaro)


March 31, 2017

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,885 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), according to the count of Microsoft Word.

*s/ Megan Barbero*
MEGAN BARBERO

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2017, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Megan Barbero*
Megan Barbero